(C.D. 4094)

JOHN V. CARR & SON, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 20, 1970)

*Dickinson, Wright, McKean & Cudlip* (*Robert S. Krause* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Velta A. Melnbrencis*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case involves the proper rate of duty assessable on a model oxygen plant that plaintiff imported from West Germany in 1964 for the account of the McLouth Steel Corporation (McLouth) of Detroit, Michigan. The importation was classified by

the government under item 737.15 of the tariff schedules providing for "Model trains, model airplanes, model boats, and other model articles * * * Other models, and construction kits or sets * * * Other" and assessed with duty at the rate of 35 percent ad valorem. Plaintiff filed a timely protest claiming that the importation should be duty free under item 737.05 providing for "Models of inventions and of other improvements in the arts, to be used exclusively as models." The issue is thus whether or not the imported model oxygen plant is a model of an invention or other improvement in the arts which was used exclusively as a model so as to be duty free under item 737.05.

There is no real dispute as to the facts. In 1963, McLouth entered into an agreement with Gesellschaft Fur Linde's Eismaschiman Akatiengesellschaft (Linde) of Munich, Germany, for the purchase of a low-pressure air separation unit or so-called oxygen plant that was to be used at McLouth's Trenton, Michigan facilities. An oxygen plant, it is to be noted, takes in air as a raw product and, using very low temperatures, isolates and distills the various elements in the air.

The oxygen plant with which we are concerned was the fourth purchased by McLouth from Linde. The first two, purchased in 1953 and 1955, had 160-ton capacities, while the third, purchased in 1958, had a 220-ton capacity. By comparison, the oxygen plant involved here had a 400-ton capacity—almost twice that of the prior plants imported by McLouth.

Due to their smaller sizes and capacities, the three earlier plants purchased by McLouth were manufactured and assembled in Germany by Linde, then disassembled, crated and shipped to the United States after the parts had been "match-marked" so that the American workmen could reassemble them. However, due to its physical size, the fourth oxygen plant (the one here in question) could not be preassembled, match-marked, disassembled, crated and shipped. Instead, the parts were manufactured abroad and imported with the piping without prefabrication; the pipes, in turn, were fabricated into bends and turns by American craftsmen. Further, in erecting the fourth plant, everything had to be measured, then fabricated and assembled at the plant site. This was in contrast to the assemblage of the prior plants which were erected from parts that had flange joints at the elbows so that the American craftsmen did not have to measure, cut and bend the various parts but only to identify pieces and bolt them together.

In the normal situation, even though a facility of this kind was not preassembled and marked, erection drawings would be furnished to guide those constructing it. This, however, was not feasible in this instance for the reason that the erection drawings and the notations thereon would be in German and too complicated to understand for

the American craftsmen constructing the plant. Instead of such erection drawings, Linde furnished McLouth with a scale model of the oxygen plant, approximately 4' x 3' x 3' in size, which was to be used in place of erection drawings as a guide in construction. (And it is this model which constitutes the subject matter of the present action.)

Following importation, the model was kept in a construction shack and was used in a variety of ways during the actual construction of the oxygen plant (which was erected by employees of an independent contractor). Thus, it was used: (1) to measure the distances of the various sections of the piping and other parts of the model, scale them, convert them into feet and inches, and then fabricate and assemble the various components of the plant itself; (2) to plan where the various craftsmen would work so that they would not interfere with each other; (3) to plan for the proper disposal of construction materials; (4) to review and estimate construction costs; and (5) generally as a visual object of what the contractor was attempting to build in order to make sure it was being constructed properly.

When construction was completed, the model was placed in the control room of the plant itself. It has since been used on two occasions by McLouth as a guide in making repairs and modifications to the plant. It has never been used for any sales presentations, exhibitions, demonstrations or for any other commercial purpose, although outside contractors have access to it in performing annual maintenance work on the plant.

Turning now to the legal aspects, plaintiff, in order to prevail, had the burden of proving (among other things) that the importation was either a model of an invention or improvement in the arts. Based on the record before us, we conclude that plaintiff has failed to meet this burden.

First, plaintiff has failed to prove that the importation is a model of an invention. According to its common meaning, the term "invention" means an original device or process, something not previously in existence.[1] In this connection, there is no evidence that the oxygen plant, of which the importation was a model, is such an original device or process. For example, the record is barren of any evidence as to when and by whom the first oxygen plant was invented, its nature,

---

[1] See e.g.:

*Webster's Third New International Dictionary* (1963):
> invention— * * * 4a: the creation of something not previously in existence: purposeful experimentation leading to the development of a new device or process: * * * b: an original device or process.

*Funk & Wagnalls New Standard Dictionary* (1963):
> invention—1. The act or process of inventing or finding out some new thing or way; origination.

*Black's Law Dictionary*, Rev. Fourth Ed. (1968):
> INVENTION. In patent law. The act or operation of finding out something new; the process of contriving and producing something not previously known or existing, by the exercise of independent investigation and experiment. Also, the article or contrivance or composition so invented. * * *

and how it compared with that imported by McLouth in 1964. Indeed, what testimony there is in the record supports the inference that the oxygen plant erected in 1964 was not an original device or process, since three other plants, the first some ten years ago, had been sold to McLouth.

Plaintiff, however, asserts that "the oxygen plant is a device invented by man just as man invented the light bulb, the automobile or the sewing machine" and that "to require proof be presented that such plant is, in fact, an 'invention' makes the impossible a prerequisite." Plaintiff adds:

> Merely because an invention is ten or twenty years old or because it has been modified does not destroy its status as an invention. * * * The more realistic view is that an object either is an "invention" or it is not. A rock obviously is not. An oxygen plant obviously is.

In essence, what plaintiff's argument seems to come down to is that for tariff purposes the term "invention" should cover all man-made articles regardless of when they were invented and whether or not they have been subsequently modified. We do not agree. In the first place, it is to be noted that as far back as 1897 tariff provisions covering models of inventions have specified "[m]odels of inventions *and of other improvements in the arts.*" See par. 616, Tariff Act of 1897. [Emphasis supplied.] If the term "inventions" was intended to have the broad scope suggested by plaintiff, the phrase "and of other improvements in the arts" would have been entirely superfluous. It should be noted further that in *United States* v. *J. D. Richardson Co.*, 28 CCPA 57, C.A.D. 125 (1940), in finding that the term "improvements in the arts" was not restricted to artistic developments but included what had been claimed to be improvements in science or industry, the court pointed out (at p. 62) that "[t]here are innumerable improvements which do not constitute invention."

Particularly pertinent are the findings in *Boas* v. *United States*, 128 Fed. 470, T.D. 25024 (Cir. Ct. S.D. N.Y. 1904):

> This importation consists of two models of steamships of the Hamburg-American Line, made at the shipbuilding yards in Germany by the same company as that which constructed the steamships of which they are exact models on a scale of 75 to 1, showing in detail the hulls, upper works, hoisting engines, propellers, twin screws, etc., and of the value of about $1,000 each, intended for exhibition in the steamship company's offices. These steamships were of the latest and highest types of express passenger steamships for ocean travel. * * * *These are not models of inventions*, but shipbuilding is of itself an art, and these small models of the latest and most improved steamships seem, strictly speaking, to be improvements in the arts. * * * [Emphasis supplied.]

Just as the models of the steamships were not models of inventions, the imported model of an oxygen plant cannot be considered a model

of an invention. See also *Meadows, Wye & Co. (Inc.)* v. *United States,* 56 Treas. Dec. 699, T.D. 43765 (1929).[2] (Whether or not the model oxygen plant is a model of an improvement in the arts depends, of course (as we discuss below), on satisfactory proof to establish improvement.)

Plaintiff states, however, that in *United States* v. *American Brown Boveri Electric Corporation,* 17 CCPA 329, T.D. 43776 (1929), the court "had no difficulty in finding that models of locomotives could be models of 'inventions' or 'other improvements in the arts' even though the locomotive was 'invented' many years before the case arose." It is to be noted, however, that the importations in *American Brown Boveri* were exact reproductions in miniature of a *patented* device (i.e., individual wheel drives), which patent was owned by American Brown Boveri. Moreover, the court did not discuss whether the device was an invention or improvement but decided the case on the basis that the imported models were not exclusively used as models.

Nor has plaintiff proven that the oxygen plant in question represents an "improvement in the arts."[3] Plaintiff's contention is that since the latest plant had almost twice the capacity of the prior plant, imported by McLouth in 1958, it is "thus quite obviously an improvement over earlier plants which modifies them and makes the plant itself more valuable, thereby meeting the definition of an 'improvement'." But this is totally insufficient for the following reasons:

(1) There is no evidence that except for size the 400-ton oxygen plant differed from other oxygen plants manufactured by Linde or other manufacturers.

(2) If there were differences between the 400-ton oxygen plant purchased by McLouth and other oxygen plants sold to it or others which would permit the 1964 plant to be considered an improvement, there is no proof as to what those differences were.

(3) There is no proof that a 400-ton capacity oxygen plant is not merely a larger version of a smaller capacity plant.

(4) Whether a 400-ton capacity oxygen plant is more valuable in terms of efficiency and economy than a smaller plant may well depend

---

[2] In *Meadows, Wye* this court in holding that miniature locomotive engines used for models, but not exclusively as such, were not properly classifiable as models, stated in passing (56 Treas. Dec. at 702) :

Again, we question whether the importations are models of inventions. The testimony shows that the locomotives imported are miniatures of the common type used by American railroads, and we question whether they are models of other improvements in the arts for the same reason.

[3] The term "improvement" has been defined as follows in *Webster's Third New International Dictionary* (1963) :

2a: the state of being improved; *esp:* enhanced value or excellence * * * b: An instance of such improvement: something that improves in this way: as * * * (2) : an alteration or addition to an existing subject of invention or discovery that does not destroy its identity or essential character but accomplishes greater efficiency or economy : a modification improving and making more valuable an existing discovery or invention.

on the needs of its user. If the latter needs only a 220-ton capacity, the 400-ton plant may well result in waste and less economy.

(5) There is no proof that 400-ton oxygen plants, such as the one sold to McLouth, were not previously manufactured by Linde or other manufacturers.

(6) There is no proof that 400-ton oxygen plants, such as the one sold to McLouth, were not in existence at the time McLouth acquired any of its other plants.

It may be added that there is nothing in *United States* v. *J. D. Richardson Co.*, *supra*, 28 CCPA 57, which would support plaintiff's position. In that case there was evidence that new designs for automobile bodies were being constantly developed.[4] Here, there is no evidence whatever that new designs for oxygen plants are being constantly developed or that the 400-ton plant itself incorporated a new design. Nor is this a matter of such common knowledge as to be subject to judicial notice. See e.g., Wigmore on *Evidence* (3d ed.) § 2571.

In short, we conclude that plaintiff has failed to prove that the importation is a model of an invention or other improvement in the arts.[5] The protest is overruled. Judgment will issue to that effect.

(C.D. 4095)

---

[4] See also *Boas* v. *United States, supra,* 128 Fed. 470, where the court found that the steamships were of the latest and highest types of express passenger steamships for ocean travel.

[5] In view of this conclusion, we do not reach the question as to whether the importation was to be used exclusively as a model.